## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM D. TURNER,

        Plaintiff,

        v.

JOHN E. WETZEL, Secretary of
Corrections, et al.,

        Defendants.

CIVIL ACTION NO. 4:18-cv-00361

(BRANN, C.J.)
(SAPORITO, M.J.)

## __REPORT AND RECOMMENDATION__

This is a prisoner civil rights action. The *pro se* plaintiff, William D. Turner, is a state prisoner incarcerated at SCI Frackville, a state prison located in Schuylkill County, Pennsylvania. In his *pro se* amended complaint, Turner alleged that various defendants deprived him of his constitutional rights under the Eighth and Fourteenth Amendments by their deliberate indifference to his serious medical needs. For years, the plaintiff suffered from a hepatitis C infection, and he alleges that the defendants refused to provide him with a particular course of medical treatment for this disease, in violation of his constitutional rights.

This action was commenced upon filing of the plaintiff's original *pro se* complaint in the Court of Common Pleas for Schuylkill County,

Pennsylvania, on January 19, 2018. (Doc. 1-1.) The action was timely removed from state court by a set of jointly represented medical defendants—Dr. Carl Keldie, Dr. Jay Cowan, and Correct Care Solutions, LLC—on February 13, 2018. (Doc. 1.) In addition to these medical defendants, the original complaint named several defendants employed by the Pennsylvania Department of Corrections (the "DOC"): John E. Wetzel, Secretary of Corrections; Joseph Silva, director of the DOC's Bureau of Health Care Services; Dr. Paul Noel, medical director of the DOC; Dr. MA Kuren, a physician and a member of the "Hepatitis C" committee at SCI Frackville; Ms. Kuras, a registered nurse supervisor at SCI Frackville; Karen Holly, corrections health care administrator at SCI Frackville; and Sharon Selbi, a registered nurse at SCI Frackville.

The medical defendants moved to dismiss the original complaint for failure to state a claim upon which relief could be granted. (Doc. 10.) On December 28, 2018, we recommended that the motion be granted in part and denied in part, and that the original complaint be partially dismissed. (Doc. 30.) We further recommended that the plaintiff be granted leave to amend his complaint to attempt to cure the pleading defects of the original complaint. On February 7, 2019, the court adopted

our recommendation and dismissed the claims against the medical defendants without prejudice and with leave to amend. (Doc. 41.)

On February 19, 2019, the plaintiff timely filed his amended complaint, adding two new defendants: Dr. Haresh Pandya, a physician who treated Turner at SCI Frackville; and Nelson Iannuzzi, a certified registered nurse practitioner who treated Turner at SCI Frackville. (Doc. 46.) On March 12, 2019, the medical defendants—joined now by Pandya and Iannuzzi—filed a motion to dismiss the amended complaint for failure to state a claim upon which relief can be granted. (Doc. 53.) That same day, the DOC defendants filed a motion to dismiss the amended complaint as well. (Doc. 55.) On January 13, 2020, we recommended that the motions be granted in part, the plaintiff's federal civil rights claims be dismissed for failure to state a claim, and the plaintiff's state-law claims be remanded to state court for further proceedings. (Doc. 75.) On March 18, 2020, the court adopted our recommendation in part and rejected it in part. (Doc. 79.) The plaintiff's claims against all but four defendants were dismissed for failure to state a claim upon which relief can be granted, but claims against Kuren, Pandya, Iannuzzi, and Correct Care Solutions were permitted to proceed.

On August 31, 2020, the remaining medical defendants—Pandya, Iannuzzi, and Correct Care Solutions—filed a motion for summary judgment. (Doc. 95). That same day, counsel for the remaining DOC defendant—Kuren—filed a separate motion for summary judgment. (Doc. 98.) On September 8, 2020, the plaintiff filed a *pro se* motion for preliminary injunctive relief. (Doc. 103.) All three motions are fully briefed and ripe for decision. (Doc. 96; Doc. 99; Doc. 100; Doc. 102; Doc. 104; Doc. 105; Doc. 106; Doc. 107; Doc. 108; Doc. 109; Doc. 110; Doc. 111; Doc. 112; Doc. 113; Doc. 114; Doc. 115; Doc. 116; Doc. 117; Doc. 120; Doc. 121; Doc. 124; Doc. 125; Doc. 126; Doc. 130; Doc. 131.)

## I. LEGAL STANDARDS

### 1. Rule 12(b)(1) Mootness Standard

The plaintiff bears the burden of establishing the existence of subject matter jurisdiction under Rule 12(b)(1). *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991). A defendant may challenge the existence of subject matter jurisdiction in one of two fashions: it may attack the complaint on its face or it may attack the existence of subject matter jurisdiction in fact, relying on evidence beyond the pleadings. *See Gould Elecs. Inc. v. United States*, 220 F.3d

169, 176 (3d Cir. 2000); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Where a defendant attacks a complaint as deficient on its face, "the court must consider the allegations of the complaint as true." *Mortensen*, 549 F.2d at 891. "In deciding a Rule 12(b)(1) facial attack, the court may only consider the allegations contained in the complaint and the exhibits attached to the complaint; matters of public record such as court records, letter decisions of government agencies and published reports of administrative bodies; and 'undisputably authentic' documents which the plaintiff has identified as a basis of his claims and which the defendant has attached as exhibits to his motion to dismiss." *Medici v. Pocono Mountain Sch. Dist.*, No. 09-CV-2344, 2010 WL 1006917, at *2 (M.D. Pa. Mar. 16, 2010). However, when a motion to dismiss attacks the existence of subject matter jurisdiction in fact, "no presumptive truthfulness attaches to plaintiff's allegations," and "the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Mortensen*, 549 F.2d at 891. This case falls into the latter category. *See Sourovelis v. City of Philadelphia*, 103 F. Supp. 3d 694, 700 (E.D. Pa. 2015) ("A challenge for mootness is properly brought by a Rule 12(b)(1) motion, and constitutes a factual

attack on the jurisdictional facts; thus, the court may consider evidence outside the pleadings."); *Democracy Rising PA v. Celluci*, 603 F. Supp. 2d 780, 787 n.10 (M.D. Pa. 2009) (applying Rule 12(b)(1) standard to mootness arguments).

## 2. Rule 56 Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion,"

and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

### 3. *Sua Sponte Dismissal Standard*

Under 28 U.S.C. § 1915A, the Court is obligated to screen a civil complaint in which a prisoner is seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a); *James v. Pa. Dep't of Corr.*, 230 Fed. App'x 195, 197 (3d Cir. 2007). The Court must dismiss the complaint if it "fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b)(1). The Court has a similar obligation with respect to *in forma pauperis* actions and actions concerning prison conditions. *See* 28 U.S.C. § 1915(e)(2)(B)(ii); 42 U.S.C. § 1997e(c)(1). *See generally Banks v. Cty. of Allegheny*, 568 F. Supp. 2d 579, 587–89 (W.D. Pa. 2008) (summarizing prisoner litigation

screening procedures and standards). "The court's obligation to dismiss a complaint under [these] screening provisions is not excused even after defendants have filed a motion to dismiss." *Id.* at 589.

The legal standard for dismissing a complaint for failure to state a claim under § 1915A(b)(1), § 1915(e)(2)(B)(ii), or § 1997e(c) is the same as that for dismissing a complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Brodzki v. Tribune Co.*, 481 Fed. App'x 705, 706 (3d Cir. 2012) (per curiam); *Mitchell v. Dodrill*, 696 F. Supp. 2d 454, 471 (M.D. Pa. 2010); *Banks*, 568 F. Supp. 2d at 588. "Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept the fact allegations in the

complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)). Nor is it required to credit factual allegations contradicted by indisputably authentic documents on which the complaint relies or matters of public record of which we may take judicial notice. *In re Washington Mut. Inc.*, 741 Fed. App'x 88, 91 n.3 (3d Cir. Sept. 25, 2018); *Sourovelis v. City of Philadelphia*, 246 F. Supp. 3d 1058, 1075 (E.D. Pa. 2017); *Banks*, 568 F. Supp. 2d at 588–89.

## II. DISCUSSION

Turner claims that the four remaining defendants were deliberately indifferent to his serious medical needs, in violation of his Eighth and Fourteenth Amendment rights. Turner, a state prisoner serving a life sentence, first tested positive for a hepatitis C infection in January 1996. At the time, available medical therapies had apparently demonstrated only limited success in curing hepatitis C, with patients experiencing significant side effects. Turner refused these treatments.

In more recent years, new antiviral medications with significantly

higher success rates and fewer side effects have become available. One such medication, Harvoni, was approved for therapeutic use in October 2014. Another, Zepatier, was approved in January 2016.

Turner originally filed this lawsuit in January 2018, claiming that he had been denied treatment with these new antiviral medications for non-medical reasons. Following partial dismissal of his amended complaint, federal and state claims against four defendants remain.

The plaintiff's surviving federal civil rights claims are brought under 42 U.S.C. § 1983. Section 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendants, acting under color of state law, deprived the plaintiff of a right secured by the United States

Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

Here, the plaintiff claims that the defendants were deliberately indifferent to his serious medical needs, in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution. He claimed that the defendants had refused to approve him for treatment with a highly effective antiviral medication, and that this denial was based on the cost of treatment, rather than for medical reasons. In his amended complaint, Turner sought declaratory relief, injunctive relief, and compensatory and punitive damages against the defendants.

The defendants have moved for summary judgment. The plaintiff also moves for preliminary injunctive relief.

## A. Motion for Preliminary Injunction

Turner has filed a motion for preliminary injunctive relief. (Doc. 103.) The relief he requests, however, does not relate to the merits of his complaint. Rather, Turner complains that documents served by counsel for the medical defendants—their responses to his written discovery requests and the production of responsive medical records—have been

intercepted and confiscated by prison officials. He appears to believe that his incoming mail from opposing counsel is privileged and confidential, and so he requests that the court order these defendants to deliver service copies of their discovery responses and document production directly to his place of incarceration in envelopes marked "legal mail." He further requests that the court order non-party prison officials to desist from withholding these discovery materials from him.[1]

Preliminary injunctive relief is extraordinary in nature and should issue in only limited circumstances. *See Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426–27 (3d Cir. 1994). Moreover, issuance of such relief is at the discretion of the trial judge. *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Chamberlain*, 145 F. Supp. 2d 621, 625 (M.D. Pa. 2001). In determining whether to grant a motion seeking preliminary injunctive relief, courts in the Third Circuit consider the following four factors: "(1) likelihood of success on the merits; (2) irreparable harm resulting from a denial of the relief; (3) the harm to the non-moving party if relief is granted; and (4) the public interest." *United*

---

[1] DOC counsel advises in its brief that DOC policy permits inmates to receive their medical records only under limited conditions, which do not include receipt by mail. (*See* Doc. 117, at 1.)

*States v. Bell*, 238 F. Supp. 2d 696, 699 (M.D. Pa. 2003). It is the moving party who bears the burden of satisfying these factors. *Bell*, 238 F. Supp. 2d at 699; *Dole*, 604 F. Supp. at 512. "Only if the movant produces evidence sufficient to convince the trial judge that all four factors favor preliminary relief should the injunction issue." *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990).

As the Third Circuit has held, "there must be a relationship between the injury claimed in the party's motion and the conduct asserted in the complaint." *Ball v. Famiglio*, 396 Fed. App'x 836, 837 (3d Cir. 2010) (per curiam) (internal quotation marks omitted). Thus, "a court may not grant an injunction when the issues raised in the motion are entirely different from those raised in the complaint." *Jones v. Taylor*, No. 3:12cv487, 2013 WL 1899852, at *2 (M.D. Pa. May 7, 2013) (citing *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220–23 (1945)); *see also Kaimowitz v. Orlando, Fla.*, 122 F.3d 41, 43 (11th Cir. 1997) ("A district court should not issue an injunction when the injunction in question is not of the same character, and deals with a matter lying wholly outside the issues in the suit.") (citing *De Beers*, 325 U.S. at 220); *Dopp v. Jones*, No. CIV-12-703-HE, 2012 WL 7192503, at *1 (W.D. Okla.

Sept. 19, 2012) ("A preliminary injunction involves intermediate relief of the same character as that which may be finally granted.") (citing *De Beers*, 325 U.S. at 220) (footnote omitted).

Moreover, the procedure for incoming legal mail alluded to by Turner is intended to permit an attorney who represents an inmate to send confidential legal correspondence to his or her inmate-client in a manner that preserves attorney-client privilege—such mail must be opened in the presence of the inmate and may only be searched for contraband, thereby ensuring that the confidential mail is not read by prison officials. *See Bieregu v. Reno*, 59 F.3d 1445, 1456 (3d Cir. 1995); *Brown v. Pa. Dep't of Corr.*, 932 A.2d 316, 318–19 (Pa. Commw. Ct. 2007). *See generally* 37 Pa. Code § 93.2. Communications from *opposing counsel* are not protected by attorney-client privilege, and thus an order directing opposing counsel to mark correspondence addressed to Turner as "legal mail" would be inappropriate and deceptive. *See United States v. Dish Network, L.L.C.*, 283 F.R.D. 420, 425 (C.D. Ill. 2012) (communications to and from opposing counsel are not privileged). *See generally Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 862 (3d Cir. 1994)

(discussing the elements of attorney-client privilege).[2]

Ultimately, and in any event, the plaintiff's request for preliminary injunctive relief is moot. The DOC defendant's brief in opposition to the motion advises that, after being apprised of this situation, DOC counsel made arrangements to release the confiscated materials to the plaintiff, and that Turner received these discovery materials, including his medical records, on September 3, 2020. (*See* Doc. 117, at 2.)

Accordingly, we recommend that the plaintiffs' motion for a preliminary injunction (Doc. 103) be denied as moot.

## B. Claims for Declaratory and Injunctive Relief

In addition to a demand for damages, the amended complaint seeks

---

[2] In support of his motion, Turner has enclosed a photocopied page from DC-ADM 803, the Pennsylvania Department of Corrections policy addressing inmate mail. (Doc. 106, at 3). He has circled text from the policy providing that "[a]ll incoming, privileged inmate correspondence" should be sent to the inmate at his place of incarceration, unlike regular mail, which is to be mailed to a third-party vendor in Florida, where it is scanned into PDF format for electronic delivery to the inmate. But the policy's definition of "incoming privileged correspondence" is limited solely to mail from the inmate's *own* attorney—not opposing counsel—or mail from a court or certain other government officials. *See* Pa. Dep't of Corr., Inmate Mail and Incoming Publications, Policy No. DC-ADM 803, Glossary of Terms at 4 (eff. Aug. 10, 2020), *available at* http://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/ 803%20Inmate%20Mail%20and%20Incoming%20Publications.pdf (last accessed Aug. 30, 2021).

declaratory and injunctive relief. The plaintiff requests a judicial declaration that his constitutional rights were violated by the defendants' alleged denial of medical treatment for hepatitis C for non-medical reasons and a permanent injunction ordering the defendants to treat his hepatitis C infection with antiviral medications.[3] Although neither set of defendants has raised this particular issue in their motions, on our own initiative, we must consider the threshold question of whether the plaintiff's claims for declaratory and injunctive relief should be dismissed as moot. *See Seneca Res. Corp. v. Twp. of Highland*, 863 F.3d 245, 252 (3d Cir. 2017) ("Our 'continuing obligation' to assure that we have jurisdiction requires that we raise issues of . . . mootness sua sponte."); *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) ("[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them."); *Gordon v. E. Goshen Twp.*, 592 F. Supp. 2d 828, 837 (E.D. Pa. 2009) (raising mootness issue sua sponte).

Here, it is clear from the record on summary judgment that, since

---

[3] The amended complaint actually articulates this demand for relief in the negative, requesting an order directing the defendants to "refrain from denying" treatment. (Doc. 46, at 8.)

filing this suit, Turner has received the particular medical treatment he sought, which has successfully cured him of his hepatitis C infection. Thus, because Turner has received the injunctive relief he originally sought, his claims for prospective injunctive relief must be dismissed as moot. *See Hollihan v. Pa. Dep't of Corr.*, 159 F. Supp. 3d 502, 509 (M.D. Pa. 2016) (dismissing injunctive relief claims where inmate-plaintiff received cataract surgery he had sought); *Parkell v. Morgan*, 47 F. Supp. 3d 217, 222 n.3 (D. Del. 2014) ("Plaintiff's claim for injunctive relief in the form of dental treatment is moot, since he has already received the treatment sought . . . ."). Moreover, the plaintiff seeks a declaration that his constitutional rights were violated by past conduct of the defendants, but "[d]eclaratory judgment is inappropriate solely to adjudicate past conduct," nor is it "meant simply to proclaim that one party is liable to another." *Corliss v. O'Brien*, 200 Fed. App'x 80, 84 (3d Cir. 2006) (per curiam) (citations omitted); *see also O'Callaghan v. Hon. X*, 661 Fed. App'x 179, 182 (3d Cir. 2016) (per curiam) (holding that a request for a judicial declaration that a defendant previously violated the plaintiff's rights is "not a proper use of a declaratory judgment, which is meant to define the legal rights and obligations of the named parties in

anticipation of *future conduct*, not to proclaim their liability for past actions") (emphasis added). *See generally Conover v. Montemuro*, 477 F.2d 1073, 1085 (3d Cir. 1972) (Adams, J., concurring) ("Neither declaratory nor injunctive relief could correct the alleged past wrong.").

Accordingly, we recommend that the plaintiff's claims for declaratory judgment and for permanent injunctive relief be dismissed as moot and for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

## C. Misjoinder of Defendant "MA Kuren"

The original and amended complaints have alleged claims for damages against a DOC-employed physician identified by the plaintiff as "MA Kuren," whom the plaintiff alleges to have participated in the decision to deny him antiviral treatment for hepatitis C.

Originally, there were several DOC defendants in this case, jointly represented by a state deputy attorney general. All but "MA Kuren," however, have been dismissed from the action. Now, on behalf of the remaining DOC defendant, "MA Kuren," counsel has moved for summary judgment on the ground that no such person exists.

In support of summary judgment, counsel for the DOC defendant

has adduced competent evidence that: (a) the state department of corrections has never employed a physician named "MA Kuren, or any variation of that spelling" (Doc. 99-1, at 2–3); (b) the state department of corrections has never employed an individual "with the name 'MA Kuren,' or any variation of that name" in *any* capacity (*id.* at 5–6); and (c) publicly available state medical board records do not reveal a physician by that name who is licensed to practice in Pennsylvania.[4]

The plaintiff adduces no facts to the contrary. Indeed, he does not dispute that there is no such person presently or formerly employed by the state department of corrections. Instead, he appears to concede that he has named the wrong defendant, suggesting that "MA Kuren" is a "misspelling" or a misreading of unspecified documents[5] referring to the name of another, previously dismissed defendant—Ms. Kuras, a

---

[4] *See* Pa. Dep't of State, Pennsylvania Licensing System Verification Service (search for last name "Kuren"), *at* https://www.pals.pa.gov/#/page/search (last accessed Aug. 24, 2021). *See generally* Fed. R. Evid. 201; *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 872 (S.D. Tex. 2020) ("[A] court may take judicial notice of a license that is available on a governmental website . . . .").

[5] Turner identifies these documents only as Exhibits A and B, but no such exhibits are attached to the amended complaint or his motion papers, and we are unable to identify any documents in the record that are consistent with this assertion.

registered nurse supervisor. (*See* Doc. 107, at 2; Doc. 108, at 1, 4.) Kuras was named as a defendant in both the original and amended complaints, but she has already been dismissed from this action based on her role as a non-medical prison official. *See Turner v. Wetzel*, Civil Action No. 4:18-cv-00361, 2020 WL 2462894, at *5 (M.D. Pa. Jan. 13, 2020), Doc. 75, *report & recommendation adopted in part and rejected in part on other grounds by* 2020 WL 1284514 (M.D. Pa. Mar. 18, 2020), Doc. 79. In his answer to the DOC defendant's statement of facts, Turner requests leave to further amend his pleadings to substitute a non-party physician with an entirely dissimilar name—Mary-Joy Monsalud—in place of "MA Kuren." (*See* Doc. 107, at 3; Doc. 108, at 4.)

We are reluctant to recommend summary judgment in favor of a purportedly non-existent defendant on a motion filed by counsel who cannot properly be said to represent the interests of that defendant, who is necessarily not a client, even if the notional defendant's interests might align with those of the attorney's actual clients.[6] Instead, we recommend that this defendant, "MA Kuren," be dismissed sua sponte for misjoinder,

---

[6] Similarly, we are reluctant to recommend summary judgment in favor of an already dismissed defendant who was named separately and described as a distinctly different individual in the pleadings.

pursuant to Rule 21 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 21 ("On motion or on its own, a court may at any time, on just terms, add or drop a party."); *see also Sabolsky v. Budzanoski*, 457 F.2d 1245, 1249 (3d Cir. 1972) ("The proper remedy in case of misjoinder is to grant severance or dismissal to the improper party if it will not prejudice any substantial right."); *Brown v. Chicago Mun. Emps. Credit Union*, No. 13 C 02597, 2014 WL 1613037, at *4 (N.D. Ill. Apr. 16, 2014) ("If the *pro se* plaintiff has named the wrong defendant, the Court is authorized by Federal Rule of Civil Procedure 21 to cure the problem.").

We further recommend that the plaintiff's request for leave to amend his pleadings—raised in his summary judgment papers rather than by a proper motion—be denied as futile. The plaintiff contends that, rather than grant summary judgment (or dismiss) with respect to "MA Kuren," the court should permit him to amend his pleadings to name Dr. Monsalud instead. Such an amendment, however, would be futile for two reasons. First, as we have already noted, Turner received the desired referral for antiviral medical treatment from prison medical staff in December 2018—more than two-and-a-half years ago. He received the antiviral treatment regimen over a twelve-week period between April

and July 2019—more than two years ago. Any claims that Monsalud participated in the denial of this medical treatment prior to that time clearly would be barred by the applicable two-year statute of limitations. *See Bougher v. Univ. of Pittsburgh*, 882 F.2d 74, 78–79 (3d Cir. 1989); *see also* 42 Pa. Cons. Stat. Ann. § 5524. Although Turner's original and first amended complaints were filed within the two-year limitations period, any newly amended claims against Monsalud would not relate back to the earlier, timely filed pleadings because she was not served with notice of the action before the limitations period expired. *See Daly v. U.S. Dep't of the Army*, 860 F.2d 592, 594 (3d Cir. 1988); *see also* Fed. R. Civ. P. 15(c)(1). Second, based on the facts alleged in the original and amended complaints and the evidence proffered by the parties in connection with summary judgment, it is clear that any such amendment would be futile because Monsalud had only a single treatment encounter with Turner prior to his referral for Zepatier antiviral medical treatment, which had nothing whatsoever to do with his hepatitis C condition.[7]

---

[7] *See Jones v. SCO Family of Servs.*, 202 F. Supp. 3d 345, 350 n.4 (S.D.N.Y. 2016) (considering evidence outside the pleadings for limited purpose of whether to grant leave to amend); *Lauter v. Anoufrieva*, 642 F. Supp. 2d 106, 1078 (C.D. Cal. 2009) ("A court may consider factual *(continued on next page)*

Accordingly, we recommend that all claims for damages against "MA Kuren" be dismissed sua sponte for misjoinder, pursuant to Rule 21 of the Federal Rules of Civil Procedure. We further recommend that the plaintiff's request for leave to file a second amended complaint naming Mary-Joy Monsalud as a newly added defendant in place of "MA Kuren" be denied as any such amendment would be futile. Finally, we recommend that the DOC defendant's motion for summary judgment (Doc. 98) be denied as moot.

### D. Fourteenth Amendment Due Process Claim

The plaintiff asserts a poorly articulated Fourteenth Amendment due process claim based on the same alleged denial of medical treatment for hepatitis C underlying his Eighth Amendment claim. Based on the

---

allegations outside of the complaint in determining whether to grant leave to amend."); *U.S. Fire Ins. Co. v. United Limousine Serv., Inc.*, 303 F. Supp. 2d 432, 445 (S.D.N.Y. 2004). In particular, we note that the summary judgment record includes undisputed evidence that Dr. Monsalud encountered Turner on August 29, 2017, at which time she examined and excised a small ganglion cyst from one of his fingers. (*See* Doc. 95-2, at 115.) Turner's next encounter with Dr. Monsalud did not occur until March 1, 2019, *after* he had been approved by the DOC medical director for the Zepatier antiviral medical treatment. (*See id.* at 362–64; *id.* at 386.) Dr. Monsalud also appears to have reviewed and approved treatment notes by non-physician medical personnel as early as January 2019, but this was also *after* he had been approved for antiviral medical treatment. (*See id.* at 383–85).

allegations of the amended complaint, we liberally construe this as a *substantive* due process claim. *See generally Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–46 (3d Cir. 2013) (discussing a court's obligation to liberally construe *pro se* pleadings and other submissions).

But the plaintiff is a convicted prisoner subject to the protections of the Eighth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989); *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000). Consequently, his substantive due process claim must be dismissed because it is barred by the "more-specific-provision rule." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 260 (3d Cir. 2010) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 843–44 (1998)). "Under this rule, 'if a constitutional claim is covered by a specific constitutional provision, such as the Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.'" *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 272 n.7 (1997)); *see also Korth v. Hoover*, 190 F. Supp. 3d 394, 406 (M.D. Pa. 2016); *Hunter v. Prisbe*, 984 F. Supp. 2d 345, 350–51 (M.D. Pa. 2013).

Accordingly, it is recommended that the plaintiff's Fourteenth Amendment substantive due process claim be dismissed as duplicative

and for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c). We further recommend that, based on the facts alleged in the amended complaint, this claim be dismissed *without* leave to amend as any such amendment would be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002).

### E. Fourteenth Amendment Equal Protection Claim

The plaintiff asserts a poorly articulated Fourteenth Amendment equal protection claim based on the same alleged denial of medical treatment for hepatitis C underlying his Eighth Amendment claim.

To prevail on an equal protection claim, a plaintiff must demonstrate that he was treated differently from persons who are similarly situated, and that this discrimination was purposeful or intentional rather than incidental. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Tillman v. Lebanon Cty. Corr. Facility*, 221 F.3d 410, 423–24 (3d Cir. 2000). Mere conclusory allegations will not suffice. *See Blanchard v. Gallick*, 448 Fed. App'x 173, 176 (3d Cir. 2011).

Turner has failed to allege or raise a material issue of fact

demonstrating that the defendants treated him differently because he is a member of a suspect class or because he exercised a fundamental right. *See City of Cleburne*, 473 U.S. at 439; *Renchenski v. Williams*, 622 F.3d 315, 337 (3d Cir. 2010). Nor has Turner alleged or raised a material issue of fact demonstrating that he was "intentionally treated differently from others similarly situated and that there [was] no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *Renchenski*, 622 F.3d at 337–38 (quoting *Olech*). While Turner has alleged in his amended complaint that he was denied medical treatment for non-medical reasons, other than a passing reference to the violation of his equal protection rights, he has failed to articulate any facts whatsoever to suggest that he was treated differently from similarly situated individuals, nor has he adduced any evidence of such different treatment in opposition to summary judgment on this issue.

The medical defendants have met their burden of making a prima facie showing that they are entitled to judgment as a matter of law based on the undisputed facts of record. The plaintiff has failed to demonstrate the existence of a genuine dispute of material fact. Accordingly, it is recommended that the medical defendants' summary judgment motion

be granted with respect to Turner's Fourteenth Amendment equal protection claim.

## F. Eighth Amendment Deliberate Indifference Claim

The plaintiff claims that the medical defendants were deliberately indifferent to his serious medical needs, in violation of his Eighth Amendment rights. This claim, however, rests exclusively on the premise that he was denied antiviral medical treatment for hepatitis C for more than two years after lab reports first indicated that his liver had become cirrhotic, but he has clearly miscomprehended the evidence upon which he relies for this premise. Moreover, the plaintiff does not challenge the protocols or policies that provided guidance to the defendants in making their treatment decisions.

### 1. Undisputed Material Facts

In support of their motion for summary judgment, and in accordance with Local Rule 56.1, the medical defendants have filed a statement of material facts as to which there is no genuine dispute. (Doc. 96.) Each factual statement therein is supported by citation to evidence of record that supports the statement. *See generally* L.R. 56.1.

In opposition to summary judgment, the *pro se* plaintiff has

submitted a statement of disputed material facts (Doc. 109) and several "affidavits" (Doc. 111; Doc. 112; Doc. 113; Doc. 114; Doc. 115; Doc. 116.) His statement of disputed material facts does not respond to the numbered paragraphs set forth in the medical defendants' statement of material facts as required by Local Rule 56.1. Indeed, with one exception, it does not actually contradict or dispute any of the material facts articulated by the medical defendants, but merely presents legal argument and commentary on the evidence. That one exception is a statement by the plaintiff that lab results dated March 23, 2016, indicated that his liver disease had advanced to cirrhosis, discussed more fully below. (*See* Doc. 109 ¶ 5.)[8]

Meanwhile, Turner's several "affidavits" likewise consist almost entirely of argument and commentary, rather than statements of facts made on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4). Two of these

---

[8] The plaintiff identifies a second purported dispute of material fact—that lab results dated December 13, 2018, indicated that he had developed cirrhosis—but this fact is not disputed by the medical defendants. (Doc. 109 ¶ 7.) They expressly acknowledged in their statement of undisputed material facts that Turner's December 2018 lab results indicated a fibrosis score of "F4," which signifies cirrhosis. (Doc. 96 ¶ 108. *See generally* Doc. 102, at 13 n.5 (explaining METAVIR staging of fibrosis, in which "F4" indicates a diagnosis of cirrhosis).)

"affidavits" address the same March 23, 2016, lab results addressed in his statement of disputed material facts.[9] (Doc. 112; Doc. 113.) In these "affidavits," Turner argues that these lab results, which included an FIB-4 score of 1.38, indicated that his liver disease had already progressed to cirrhosis, contradicting later treatment findings by Pandya and Iannuzzi characterizing his condition as "stable" and his fibrosis staging as merely F0 (no fibrosis) to F2 (moderate fibrosis).[10] But this fact "dispute" is based entirely upon a plain misunderstanding of the evidence. Turner appears to conflate his March 2016 *FIB-4* score[11] with his later assessment in December 2018 of METAVIR fibrosis score of *F4*, which indicates cirrhosis.[12] Thus, we find that Turner has failed to demonstrate a genuine

---

[9] The "affidavit" includes a photocopy of these lab results. (Doc. 112, at 3.) We note that this same lab report can also be found in the medical records submitted by the medical defendants. (Doc. 95-2, at 91.)

[10] (*See also* Doc. 130, at 3 (asserting that "FIB-4 . . . is cirrhosis").)

[11] A FIB-4 score is "a non-invasive assessment of liver disease based on routine laboratory studies." *See Pfaller v. Clarke*, ___ B.R. ____, 2021 WL 1724933, at *2 n.5 (E.D. Va. Apr. 30, 2021). As the evidence cited by Turner himself indicates, a FIB-4 score of less than 1.45 has "a *negative* predictive value of 90% for advanced fibrosis." (*See* Doc. 113, at 3 (emphasis added).) Thus, Turner's March 2016 FIB-4 score of 1.38 strongly indicated a moderate or lesser degree of liver scarring—i.e., not cirrhosis. (*See id.*)

[12] *See supra* note 8; *Pfaller*, 2021 WL 1724933, at *1 n.2 ("Fibrosis (i.e., scarring is measured on a scale from F0 (no scarring) to Stage F4 *(continued on next page)*

dispute of material fact with respect to the medically determinable progression of his fibrosis in March 2016—that is, he has failed to adduce any competent evidence to support his factual assertion that his fibrosis had advanced to cirrhosis at that time. *See Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 464 (E.D. Pa. 2013) (rejecting evidentiary citations that did not support the factual assertions they accompanied).

The remainder of Turner's "affidavits" likewise do nothing to demonstrate a genuine dispute of material fact. *See id.* One "affidavit" addresses the undisputed December 2018 lab results, based on which Turner's fibrosis was diagnosed as having then progressed to cirrhosis. (Doc. 114.) *See supra* note 8. Two other "affidavits" contain no factual statements whatsoever. (Doc. 111; Doc. 115.) The last of the plaintiff's six "affidavits" addresses a set of four Rule 36 requests for admission served by the plaintiff, to which the medical defendants purportedly failed to respond. (Doc. 116.) As a result, the plaintiff suggests that these unanswered requests should be deemed admitted. *See generally* Fed. R. Civ. P. 36(a)(3). But the *pro se* plaintiff's four requests did not contain

_____

(cirrhosis). In between, Stage F1 is considered early scarring, Stage F2 is considered scarring of particular part of the liver, and Stage 3 is advanced scarring.") (citation and internal quotation marks omitted).

any specific factual assertions upon which he can rely in opposing summary judgment. *See Kasar v. Miller Printing Mach. Co.*, 36 F.R.D. 200, 203 (W.D. Pa. 1964) ("The rule respecting requests for admissions of facts should not be used unless a statement of facts sought to be admitted is so phrased that it can be admitted or denied without explanation . . . ."). Here, the plaintiff's requests were phrased in the form of open-ended *interrogatories* rather than requests to admit or deny specific factual assertions; the plaintiff asked whether Pandya or Iannuzzi was an infectious disease specialist and, if not, to what specialist they referred his case. (*See* Doc. 116, at 3.) The medical defendants' failure to respond to these inartful discovery requests is of no evidentiary value under these circumstances.

Accordingly, the statements of material fact submitted by the medical defendants and supported by citation to the record shall be deemed admitted pursuant to Local Rule 56.1. *See Knapp v. U.S. Dep't of Health & Hum. Servs.*, Civil Action No. 3:18-1422, 2020 WL 969624, at *1 n.3 (M.D. Pa. Feb. 28, 2020); *Shreegi Enters., Inc. v. United States*, Civil No. 1:CV-15-2232, 2018 WL 1919576, at *4 n.2 (M.D. Pa. Apr. 24, 2018). These undisputed material facts are recounted below.

Turner is a state prisoner, serving a life sentence. In January 1996, lab testing first revealed that he was positive for the hepatitis C antibody. Over the years, at several different state correctional institutions, additional lab testing confirmed this infection. Turner was informed of the diagnosis, counseled, and provided with information on hepatitis C. At various times prior to 2014, Turner refused therapy for his hepatitis C infection, which at the time consisted of a combination of Ribavirin and Interferon A.[13] Over the years, Turner was regularly seen for his hepatitis C in the chronic care clinic at each institution where he was incarcerated.

On September 23, 2014, Turner was transferred to SCI Frackville. A medical evaluation performed that day noted that he suffered from diabetes, hypertension, and hepatitis C. The next day, September 24, 2014, Pandya reviewed Turner's medical chart and medications and indicated that Turner was to follow up in chronic care clinic. Turner was seen in the chronic care clinic on October 23, 2014. He was seen again in

---

[13] Although the parties have not so stated, it is our understanding that this earlier treatment regimen for hepatitis C was known to cause serious side effects and yielded much lower cure rates than the modern antiviral medications now available. The first such antiviral medication, Harvoni, was approved by the FDA in October 2014.

the chronic care clinic on March 16, 2015, at which time Pandya performed a physical exam and ordered lab work.

On April 16, 2015, Turner was seen by a nurse, Sharon Selbi, to provide him with information on a Temple University project for treatment of hepatitis B. Turner told Selbi that he knew he had hepatitis C, but he did not know that he had hepatitis B. Selbi reviewed his chart, which reflected a positive test for hepatitis B in 1998. Selbi indicated in her treatment notes that she would discuss the issue with a non-party physician, Dr. Gardner. She answered all of Turner's questions and he indicated that he understood the information she provided.

On June 1, 2015, Selbi met with Turner again when he presented for sick call. Selbi advised him that Gardner recommended repeating his hepatitis profile. Turner acknowledged his understanding of the same, and Selbi advised him that they would speak again when his lab results were back. On June 2, 2015, Pandya ordered a hepatitis profile.

On June 23, 2015, Turner had blood taken for a hepatitis profile. On June 25, 2015, Iannuzzi reviewed the results. Iannuzzi noted in Turner's medical record that the inmate was not actively positive for

hepatitis B,[14] but he was hepatitis C positive. On June 30, 2015, Iannuzzi met with Turner to discuss his lab results. Iannuzzi informed Turner that he was not actively hepatitis B positive.

On July 1, 2015, Selbi noted in Turner's record that Turner's hepatitis profile lab results were discussed with Dr. Gardner during a telemedicine visit the prior day, June 30, 2015. She noted that Dr. Gardner stated that Turner did not have to be followed for hepatitis B, he could be removed from the contagious disease list, and he did not need to participate in the Temple University project. Turner's chart was given to Pandya for an order to remove him from the hepatitis B list. Later that same day, Pandya noted that Turner was now negative for hepatitis B and had been successfully cleared of the infection. Pandya ordered Turner disenrolled from the hepatitis B chronic care clinic.

On September 3, 2015, Turner was seen by Pandya in the chronic care clinic. Upon examination, Pandya noted no evidence of ascites. Panday reviewed lab results from August 11, 2015, which revealed a

---

[14] The lab results appear to indicate that Turner had recovered from a prior hepatitis B infection, but he was not currently infected. We note that the lab results also appear to indicate that Turner tested negative for hepatitis A at the time.

MELD score of 6.[15] Turner was educated on reaching his goals and advised to increase his exercise/walking. Pandya ordered additional lab work and a return to care in six months.

On January 19, 2016, Turner presented to Iannuzzi for sick call. In addition to unrelated complaints, Turner reported that he had a rash on his back, which he attributed to his hepatitis C infection. On examination, Iannuzzi noted no evidence of edema, a soft abdomen without ascites, and no significant rash. Turner refused pain medications that were offered. He was instructed to follow up in chronic care clinic per protocol.

On March 8, 2016, Turner was seen in the chronic care clinic, and Pandya performed a physical examination. Upon examination, Pandya noted no evidence of ascites. Pandya noted that Turner was medically stable. Pandya ordered lab work to evaluate Turner's hepatitis C viral load, and he instructed Turner to return to care in six months.

On March 23, 2016, Turner had blood taken for laboratory testing.

---

[15] "MELD is an acronym which means Model for End-Stage Liver Disease." *United States v. Musto*, No. 3:10-CV-338, 2014 WL 47351, at *2 (M.D. Pa. Jan. 7, 2014). It is one method for measuring the severity of liver disease. *Id.* "The score ranges from 6 to 40 (40 being the worst)." *Id.*

The lab results revealed that he was hepatitis C positive with a viral load of 883,440. Upon review of these results on March 28, 2016, Iannuzzi noted a MELD score of 7.5, APRI score of 0.327, and FIB-4 score of 1.38. Iannuzzi indicated that he planned to follow up with Turner in chronic care clinic.

On August 16, 2016, Turner had blood and urine samples taken for laboratory testing. On September 1, 2016, Turner was seen by Pandya at chronic care clinic. Upon examination, Pandya noted no evidence of ascites. Upon review of Turner's recent lab results, Pandya noted a MELD score of 7 and a viral load of 883,440. Pandya noted that Turner's hepatitis C was medically stable. Pandya ordered additional lab work, and he instructed Turner to return to care in six months.[16]

On December 9, 2016, Turner had blood taken for laboratory testing.

On February 1, 2017, Turner had blood taken for laboratory testing. On February 20, 2017, Turner presented to Pandya complaining of a rash. Upon examination, Pandya noted no obvious rash.

---

[16] Pandya's notes also reflect orders for additional treatment encounters in the interim to address an unrelated condition, possibly carpal tunnel syndrome.

On March 1, 2017, Turner presented to Iannuzzi primarily for other complaints, but he also stated that he had done some research and thought he was supposed to get a cream to protect his skin because he was hepatitis C positive. Upon examination, Iannuzzi observed no rash, no open areas, no flaking. Iannuzzi ordered additional lab work.

On March 3, 2017, Turner had blood taken for laboratory testing. On March 7, 2017, Turner was seen by Pandya at chronic care clinic. Rather than hepatitis, the encounter primarily focused on prospective surgical removal of a cyst on Turner's finger, and on his diabetes and hypertension. Pandya did note, however, that Turner had received hepatitis A and B vaccines in September 2015.

In May 2017, Turner was transferred—apparently temporarily—to SCI Graterford. In connection with his transfer, medical records noted that he had a history of glaucoma, cardiac disease, neuropathy, carpal tunnel syndrome, type-2 diabetes, hypertension, and hepatitis C.

On August 16, 2017, Turner had blood taken for laboratory testing. On September 14, 2017, Turner was seen by Pandya at chronic care clinic. Upon examination, Pandya noted no evidence of ascites. Upon review of Turner's recent lab results, Pandya noted an APRI score of

0.345, a MELD score of 9, and a viral load of 883,440. Pandya noted that Turner's hepatitis C was medically stable. Pandya assessed a METAVIR fibrosis stage of F0 to F2, and he instructed Turner to return to care in six months. Pandya ordered an ultrasound of Turner's abdomen and liver to look for portal hypertension and hepatoma. He also ordered additional lab work.

On October 5, 2017, Turner underwent an ultrasound of his abdomen, which revealed: (1) mildly heterogenous liver with normal size; (2) borderline portal hypertension; (3) no ascites or splenomegaly; and (4) no cholelithiasis or biliary dilation.

On February 6, 2018, Turner had blood taken for laboratory testing. On March 29, 2018, Turner was seen by Pandya at chronic care clinic. Upon examination, Pandya noted no evidence of ascites. He noted Turner's ultrasound results without comment. Upon review of Turner's recent lab results, Pandya noted an APRI score of 0.428 and a viral load of 883,440. Based on the APRI of less than 1.5, Pandya assessed a METAVIR fibrosis stage of F0 to F2 and noted that Turner's liver disease status was well-controlled and unchanged. Pandya instructed Turner to return to care in six months.

On October 11, 2018, Turner was seen by Pandya at chronic care clinic. Upon examination, Pandya noted no evidence of ascites. Upon review of Turner's most recent lab results, Pandya noted an APRI score of 0.295 and a viral load of 883,440. Based on the APRI of less than 1.5, Pandya assessed a METAVIR fibrosis stage of F0 to F2 and noted that Turner's liver disease status was improved, based on the significant change to his APRI. Pandya instructed Turner to return to care in six months. He also ordered additional lab work.

On December 11, 2018, a non-party nurse, Christine Rushton, completed a hepatitis C referral form. The form noted Turner's October 2017 ultrasound results and his most recent APRI score of 0.295 and MELD score of 9. Rushton noted no exclusions to treatment. She also placed an order for updated lab work, including a Fibrosure test.

On December 12, 2018, Turner had blood taken for Fibrosure testing. On December 18, 2018, lab results were returned with a Fibrosure score of 0.84, which is indicative of stage F4 fibrosis—cirrhosis.[17] On December 29, 2018, the DOC's medical director, Dr. Noel,

---

[17] This particular fact is not included in the medical defendants' statement of undisputed material facts, and the lab report upon which it

*(continued on next page)*

approved Turner for treatment with antiviral medication. Dr. Noel's hepatitis C final evaluation form expressly acknowledged that Fibrosure testing indicated F4 fibrosis.

On January 8, 2019, Rushton ordered lab work to be taken on February 11, 2019, in anticipation of antiviral medical treatment. This lab work order included testing for HIV. On January 9, 2019, Rushton noted in Turner's medical record that he had refused HIV testing, despite being advised that the test was a prerequisite to the hepatitis C antiviral treatment he sought.

On March 1, 2019, Turner was seen by Monsalud in connection with possible glaucoma and cataracts and the return of a cyst on his finger. In addition, they discussed recent abdominal ultrasound results, which had indicated no changes to his liver, and his ongoing evaluation for hepatitis C antiviral treatment.

---

is based was not included in the otherwise comprehensive medical records submitted by the medical defendants in support of their motion for summary judgment. The plaintiff has submitted that lab report as an exhibit to one of his "affidavits" in opposition to summary judgment. (Doc. 114, at 3.) Although not present in the medical records submitted by the medical defendants, these particular lab results are undisputed, and they are clearly acknowledged in Dr. Noel's subsequent evaluation and approval for treatment with antiviral medication.

On March 7, 2019, Turner was seen by Monsalud at chronic care clinic. They discussed the results of a recent endoscopic procedure performed in connection with his evaluation for hepatitis C antiviral treatment. The endoscopy had revealed gastritis but no varices, and a biopsy was done to check for H. pylori infection. Monsalud also excised a cyst from Turner's finger. Upon examination, Monsalud noted no evidence of ascites. Upon review of Turner's most recent lab results, Monsalud noted an APRI score of 0.332 and a viral load of 195,591. Apparently based on the Fibrosure results, Monsalud assessed a METAVIR fibrosis stage of F4 and noted that Turner's liver disease status was poorly controlled. She noted that he was in the final stages of evaluation for hepatitis C antiviral treatment. Monsalud instructed Turner to return to care in six months.[18] She also ordered an ultrasound and additional lab work.

Later that same day, March 7, 2019, Rushton noted in Turner's medical file that he had consented to HIV testing. On March 8, 2019,

---

[18] We note that Monsalud's treatment notes acknowledge that Turner's stage F4 fibrosis diagnosis indicated a one-month return-to-care interval, but she appears to have scheduled him for a six-month period because he was under the active care of outside medical specialists.

Iannuzzi placed an order for pre-treatment lab testing. On March 18, 2019, Rushton placed an order for additional pre-treatment lab testing. On April 2, 2019, Rushton placed orders for lab work to be done at intervals during and after his antiviral treatment.

On April 2, 2019, Turner was seen by Dr. Neha Agrawal at the Temple University treatment clinic to initiate hepatitis C antiviral treatment. Upon review of Turner's most recent lab results, Agrawal noted a viral load of 195,591 and a fibrosis score of F4. She noted that the plan was to treat with Zepatier for twelve weeks, with lab work to be reviewed at regular intervals during and after treatment. Agrawal instructed Turner to return for a follow-up visit in three months.

On June 5, 2019, Turner was seen by Monsalud at chronic care clinic. Upon review of Turner's most recent lab results, Monsalud noted an APRI score of 0.096 and an undetectalbe viral load. Monsalud found Turner's liver disease to be well controlled. Monsalud instructed Turner to return to care in six months, and she ordered additional lab work.

On July 9, 2019, Turner was seen by Dr. Amirali Kiyani at the Temple University treatment clinic for a twelve-week follow-up appointment. Based on recent lab results, Kiyani noted that Turner's

HCV RNA was undetectable at the end of treatment. Kiyani instructed Turner to return to care in three months, and he ordered additional lab work.

On September 5, 2019, Turner was seen by Monsalud at chronic care clinic. Upon examination, Monsalud noted no evidence of ascites. Upon review of Turner's most recent lab results, Monsalud noted an APRI score of 0.131 and an undetectable viral load. She found his liver disease to be well controlled. Monsalud instructed Turner to return to care in six months, and she ordered additional lab work.

On October 8, 2019, Turner was seen by Dr. Kiyani for a 24-week post-treatment follow-up appointment. Based on recent lab results, Kiyani noted that Turner's viral load remained undetectable. Kiyani concluded that Turner had achieved a sustained virologic response, or no detectable amount of HCV, after 12 weeks post-treatment. No further HCV testing was required, only routine cirrhosis care.

On March 23, 2020, Turner was seen by Monsalud at chronic care clinic. Upon examination, Monsalud noted no evidence of ascites. Monsalud noted a history of cirrhosis based on a fibrosis score of F4, but upon review of Turner's most recent lab results, she noted an APRI score

of 0.128 and an undetectable viral load. Monsalud assessed the status of Turner's liver disease to be "good." Monsalud instructed Turner to return to care in six months, and she ordered additional lab work.

### 2. Analysis

The Eighth Amendment to the United States Constitution protects prisoners from cruel and unusual punishment, including "the unnecessary and wanton infliction of pain." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). To prevail on an Eighth Amendment claim, an inmate must show: (1) a deprivation that is objectively sufficiently serious; and (2) "a sufficiently culpable state of mind" of the defendant official. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994). There are different standards for Eighth Amendment violations depending on the type of claim. An Eighth Amendment challenge to prison conditions such as this is subject to the deliberate indifference standard. *See id.* at 835–36. Prison officials are deliberately indifferent when they know of and disregard a substantial risk of harm to a prisoner. *Id.* at 836. Moreover, a prisoner must produce evidence of serious or significant physical or emotional injury resulting from the challenged prison condition. *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995).

> To be liable on a deliberate indifference claim, a defendant prison official must both "know[] of and disregard[] an excessive risk to inmate health or safety." The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and citing *Farmer*, 511 U.S. at 837–38, 842, 844) (citations omitted) (alterations in original).

To state a cognizable Eighth Amendment claim for improper medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "This standard is two-pronged. It requires deliberate indifference on the part of prison officials and it requires the prisoner's medical needs to be serious." *West v. Keve*, 571 F.2d 158, 161 (3d Cir. 1978).

With respect to the deliberate indifference prong of the *Estelle* standard, prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients. *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979). "[M]ere allegations of malpractice do not raise issues of constitutional import." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). A mere difference of opinion between the prison medical staff and the inmate regarding the diagnosis or treatment received by the inmate does not constitute deliberate indifference. *Id.* at 346; *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988). Moreover, a prison doctor's use of a different treatment regimen than that prescribed by a private physician does not amount to deliberate indifference. *Johnson v. Cash*, 557 Fed. App'x 102, 104 (3d Cir. 2013) (per curiam) (citing *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977)). "While the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990). The key question is whether the defendant provided the inmate with some type of

treatment, regardless of whether it is what the plaintiff desires. *Farmer*, 685 F. Supp. at 1339. The complaint must allege that the defendant "knows of the prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment for a non-medical reason, or prevents a prisoner from receiving needed medical treatment." *Lopez v. Corr. Med. Servs., Inc.*, 499 Fed. App'x 142, 146 (3d Cir. 2012).

With respect to the serious medical need prong of the *Estelle* standard, a serious medical need exists if failure to treat such condition would constitute a "denial of the minimal civilized measure of life's necessities." *Farmer*, 511 U.S. at 825.

> [T]he concept of a serious medical need . . . has two components, one relating to the consequences of a failure to treat and one relating to the obviousness of those consequences. The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death. Moreover, the condition must be "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."

*Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting *Lanzaro*, 834 F.2d at 347).

Here, Turner's Eighth Amendment claim relies solely on his own

- 48 -

lay opinion regarding the proper course of treatment for his hepatitis C infection—including his own lay interpretation of laboratory testing results, in which he has mistakenly concluded that he had demonstrated stage F4 fibrosis/cirrhosis more than two years before lab testing actually revealed results to support such a diagnosis—and on a purely conclusory allegation that he was denied that course of treatment due for non-medical reasons (i.e., cost).

But to survive summary judgment, the plaintiff is required to point to *some* evidence to show that the medical defendants knew or were aware of a substantial risk of serious harm to him based on their treatment of his hepatitis C. *See Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001). The evidence of record demonstrates that, over the course of years, Turner was regularly seen and evaluated by the medical defendants and other medical providers to assess and treat his various medical conditions, including his hepatitis C infection and liver disease. Until December 2018, Turner's lab testing results consistently showed results—including both APRI scores and MELD scores—indicative of no more than moderate fibrosis. Based on these lab testing results and physical examination, Turner's liver disease was repeatedly

assessed as being stable. Based on hepatitis C treatment protocols in place at the time, Turner appears to have been categorized as an "intermediate priority" for antiviral treatment.[19]

On December 11, 2018, a nurse began prepared the necessary forms for Turner's referral for antiviral treatment at an outside clinic. As a part of that process, she ordered additional lab testing, including a Fibrosure test. A December 12, 2018, blood draw was subjected to the Fibrosure test, and the Fibrosure testing results returned on December 18, 2018,

---

[19] A copy of the Hepatitis C Protocol in effect at the time was previously made a part of the record of this case in connection with an earlier motion for preliminary injunctive relief. (*See* Doc. 48-4, at 17–28.) *See generally* Fed. R. Civ. P. 56(c)(3). Based on this protocol, Turner appears to have been categorized as an "intermediate priority" for antiviral treatment because he suffered from the comorbid medical condition of diabetes mellitus. (*See* Doc. 48-4, at 24.) But for his diabetes, his APRI scores suggest that he would have been categorized as a "low priority" for antiviral treatment. (*See id.*) Following his Fibrosure test results, which indicated F4 stage fibrosis (i.e., cirrhosis), it appears he would have been categorized as a "high priority" for antiviral treatment, despite his low APRI scores. (*See id.* at 23.) The Hepatitis C Protocol currently in effect would appear to dictate the same categorization. *See* Pa. Dep't of Corr., Access to Health Care, Policy No. 13.2.1, at 20-5 to -6 (eff. Aug. 10, 2020), *available at* https://www.cor.pa.gov/About%20Us/Documents/DOC%20Policies/13.02.01%20Access%20to%20Health%20Care.pdf (last accessed Aug. 30, 2021). *See generally Shakur v. Costello*, 230 Fed. App'x 199, 201 (3d Cir. 2007) (per curiam) (taking judicial notice of county prison policies); *Leonhauser v. Long*, Civil Action No. 1:11-0341, 2012 WL 398642, at *3 n.2 (M.D. Pa. Jan. 4, 2012) (taking judicial notice of state prison policies).

indicated that Turner had stage F4 fibrosis (i.e., cirrhosis). Based on the hepatitis C treatment protocols, Turner's categorization would appear to have then been elevated to a "high priority" for antiviral treatment.

On December 29, 2018, the DOC medical director formally approved Turner for antiviral treatment. Further evaluation was necessary before commencing the antiviral medication treatment, but Turner was referred soon after to a Temple University clinic for treatment. Between April and July 2019, Turner received a twelve-week course of treatment with the Zepatier antiviral medication. Post-treatment, lab testing revealed that he was free of any hepatitis C infection.

Turner's claim hinges on his allegations that lab test results showed that his liver had become cirrhotic more than two years earlier, in March 2016, and that the medical defendants ignored those results and denied antiviral treatment for non-medical reasons. But, as discussed above, Turner's lay interpretation of these lab results is plainly mistaken. Otherwise, he has failed to point to any evidence whatsoever that suggests that the medical defendants knew that he faced a substantial risk of serious harm and disregarded that risk by failing to

take reasonable measures to abate the risk. Although he was ultimately diagnosed with F4 fibrosis (or cirrhosis) shortly before receiving antiviral treatment, all medical evidence preceding that test supported the defendants' assessment of no more than stage F0 to F2 fibrosis (no fibrosis to moderate fibrosis). Nor is there any evidence whatsoever that the issue of cost was a factor in the treatment of Turner's medical condition.

Based on the foregoing, the medical defendants are entitled to summary judgment with respect to the plaintiff's claims alleging inadequate medical treatment. *See Lanzaro*, 834 F.2d at 346 (deliberate indifference may be shown only where prison officials have actual knowledge of the need for treatment, yet intentionally refuse to provide any appropriate care). Accordingly, it is recommended that the medical defendants' summary judgment motion be granted with respect to Turner's Eighth Amendment claim for deliberate indifference to serious medical needs.

### G. State-Law Claims

In addition to the federal civil rights claims discussed above, the amended complaint asserted state-law professional and corporate

negligence claims against the medical defendants. But where a district court has dismissed all claims over which it had original jurisdiction, the court may decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3). Whether the court will exercise supplemental jurisdiction is within its discretion. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). That decision should be based on "the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Ordinarily, when all federal law claims have been dismissed and only state-law claims remain, the balance of these factors indicates that these remaining claims properly belong in state court. *Cohill*, 484 U.S. at 350. Finding nothing in the record to distinguish this case from the ordinary one, the balance of factors in this case "point[s] toward declining to exercise jurisdiction over the remaining state law claims." *See Cohill*, 484 U.S. at 350 n.7. Therefore, it is recommended that the plaintiff's state-law claims be dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## III.   RECOMMENDATION

For the foregoing reasons, it is recommended that:

1.     The plaintiff's motion for a preliminary injunction (Doc. 103)

be **DENIED** as moot;

2.    The plaintiff's claims for declaratory and injunctive relief be **DISMISSED** as moot and for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure;

3.    The plaintiff's claims for damages against defendant "MA Kuren" be **DISMISSED** sua sponte for misjoinder, pursuant to Rule 21 of the Federal Rules of Civil Procedure;

4.    The plaintiff's request for leave to file a second amended complaint naming Mary-Joy Monsalud as a newly added defendant in place of "MA Kuren" be **DENIED** as futile;

5.    The DOC defendant's motion for summary judgment (Doc. 98) be **DENIED** as moot;

6.    The plaintiff's Fourteenth Amendment substantive due process claim be **DISMISSED** for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii), 28 U.S.C. § 1915A(b)(1), and 42 U.S.C. § 1997e(c);

7.    The medical defendants' motion for summary judgment (Doc. 95) be **GRANTED** with respect to the plaintiff's Fourteenth Amendment equal protection and Eighth Amendment deliberate indifference claims;

8.     The Clerk be directed to enter **JUDGMENT** in favor of the medical defendants—Correct Care Solutions, LLC; Dr. Haresh Pandya; and Nelson Iannuzzi, CRNP—with respect to the plaintiff's Fourteenth Amendment equal protection and Eighth Amendment deliberate indifference claims;

9.     The Court decline to exercise supplemental jurisdiction over the plaintiff's state-law professional negligence claims, pursuant to 28 U.S.C. § 1367(c)(3); and

10.     This action be **REMANDED** to the Court of Common Pleas of Schuylkill County, Pennsylvania, for further proceedings, pursuant to the Court's inherent authority to remand supplemental claims, *see Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988).[20]

Dated: August **30**, 2021

*Joseph F. Saporito, Jr.*

JOSEPH F. SAPORITO, JR.
United States Magistrate Judge

---

[20] *See generally Salazar v. San Juan Cty. Detention Ctr.*, 301 F. Supp. 3d 992, 1008–09 (D.N.M. 2017) ("[A] remand under § 1367(c) is not, despite the text and structure of the relevant statutes, a remand under § 1447, but rather, a remand under § 1367(c) and *Carnegie-Mellon University v. Cohill*.").

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM D. TURNER,

        Plaintiff,

        v.

JOHN E. WETZEL, Secretary of
Corrections, et al.,

        Defendants.

CIVIL ACTION NO. 4:18-cv-00361

(BRANN, C.J.)
(SAPORITO, M.J.)

### NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered the

foregoing Report and Recommendation dated August __30__, 2021. Any

party may obtain a review of the Report and Recommendation pursuant

to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed
> findings, recommendations or report addressing a
> motion or matter described in 28 U.S.C. § 636(b)(1)(B)
> or making a recommendation for the disposition of a
> prisoner case or a habeas corpus petition within
> fourteen (14) days after being served with a copy thereof.
> Such party shall file with the clerk of court, and serve
> on the magistrate judge and all parties, written
> objections which shall specifically identify the portions
> of the proposed findings, recommendations or report to
> which objection is made and the basis for such
> objections. The briefing requirements set forth in Local
> Rule 72.2 shall apply. A judge shall make a de novo
> determination of those portions of the report or specified

proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Failure to file timely objections to the foregoing Report and Recommendation may constitute a waiver of any appellate rights.

Dated: August __**30**__, 2021

JOSEPH F. SAPORITO, JR.
United States Magistrate Judge